[Cite as *State v. Lewis*, 2022-Ohio-2357.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                    No. 110815

    v.                               :

SOLOMON LEWIS,                          :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED
IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** July 7, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-615253-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Anthony Miranda and Kristen Hatcher,
Assistant Prosecuting Attorneys, *for appellee.*

Robinson & Brandt, P.S.C. and Jeffrey M. Brandt, *for
appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1}   Defendant-appellant Solomon Lewis appeals his convictions after he pled guilty to one count of attempted murder (with criminal gang activity, firearm and forfeiture specifications), two counts of felonious assault (with criminal gang

activity, firearm and forfeiture specifications) and one count of improperly discharging firearm into habitation (with firearm and forfeiture specifications). He argues that probable cause was not shown to warrant the mandatory transfer of jurisdiction from the juvenile court to the general division and that the general division lacked jurisdiction to convict him on Count 7 — the improperly-discharging-firearm-into-habitation count — because the juvenile court had previously dismissed an identical charge after finding that there was no probable cause to believe Lewis committed the offense. He also argues that (1) mandatory bindovers and Ohio's "more than a mere suspicion" standard for establishing probable cause violate due process, (2) that his counsel was ineffective for failing to make various arguments below and (3) the record does not support the trial court's findings in support of the imposition of consecutive sentences. For the reasons that follow, we vacate Lewis' conviction on Count 7 and remand for the issuance of a new sentencing journal entry reflecting (1) that the conviction on Count 7 has been vacated, (2) the correct sentence on Count 4 (as imposed by the trial court at the sentencing hearing) and (3) all of the consecutive sentence findings made by the trial court at the sentencing hearing. We otherwise affirm Lewis' convictions.

**Procedural History and Factual Background**

**Juvenile Court Proceedings**

{¶ 2} On March 24, 2016, the state filed an eight-count delinquency complaint in the Cuyahoga County Court of Common Pleas, Juvenile Division (Cuyahoga C.P. Juv. No. DL-16-104710) against Lewis (d.o.b. 3/2/1998), alleging

that he had committed acts that would constitute the following crimes if he were an adult: one count of attempted murder in violation of R.C. 2903.02(A) and 2923.02 (Count 1), five counts of felonious assault in violation of R.C. 2903.11(A)(2) (Counts 2-6), one count of felonious assault in violation of R.C. 2903.11(A)(1) (Count 7) and one count of improperly discharging firearm into habitation in violation of R.C. 2923.161(A)(1) (Count 8). All of the counts included criminal gang activity specifications and one-, three- and five-year firearm specifications. The charges related to Lewis' alleged role in a drive-by shooting that occurred on January 15, 2016 on Union Avenue in Cleveland. As a result of the shooting, a teenage girl was shot in the leg. The case was subject to mandatory transfer pursuant to R.C. 2152.12(A)(1)(a)(i).

**Probable Cause Hearing**

{¶ 3} On April 29, 2016, the juvenile court held a probable cause hearing. Eyewitness Tomekia Martin and Detective Michael McNeeley with the Cleveland Police Department's Gang Impact Unit testified on behalf of the state. Lewis presented no witnesses at the probable cause hearing.

{¶ 4} Martin testified that on the afternoon of January 15, 2016, she was backing up her car at her home on Union Avenue in Cleveland when she saw a young man she knew as "Car Wash" walking with a young woman. The couple was walking eastbound on Union Avenue towards the bus stop at the intersection of Union Avenue and East 93rd Street. Martin stated that, approximately three minutes later, while she was letting her dogs out in her yard, she saw Car Wash running westbound

on Union Avenue, back towards his home on East 88th Street, with two men chasing after him. She testified that one of the men was "kind of tall" and was wearing a gray, "like a bubbly coat * * * like a quilted-type jacket." Martin stated that the two men who were chasing Car Wash turned around and walked back towards East 93rd Street. Martin testified that after the two men turned around, she asked Car Wash what was going on and whether he was okay. She stated that Car Wash responded that the two men were "trying to jump me."

{¶ 5} Martin testified that she put her dogs inside the house, then got into her car and went looking for the two men. She stated that the men were still walking on Union Avenue when she saw them and that she began driving slowly, following them. Martin testified that the two men walked to a store parking lot where they got into a "tannish, brownish" Chevy Malibu. A young woman and another male were already in the vehicle. The male was driving, and the woman was seated behind him on the driver side. The two men who had been walking got into the vehicle on the passenger side. One man sat in the front passenger seat and the other man sat in the rear passenger seat.

{¶ 6} Martin followed the vehicle as it cut across the parking lot, waited at a busy intersection (filled with buses and cars as a nearby school was letting out) and then pulled out into the street. Martin testified that there were two cars between her vehicle and the Malibu as they travelled westbound on Union Avenue back towards her house; Martin was traveling in the right lane and the Malibu was traveling in the left lane. The Malibu suddenly "jammed on the brakes," and Martin saw the front

passenger door of the Malibu swing open. Martin testified that the shooter's "whole body was like turned" and that she saw "part of the arm that was shooting." She heard three or four gunshots then saw a woman hit the ground as people started running and screaming. According to Martin, the shots were fired into a "crowd" consisting of Car Wash and "his brothers, cousins, whatever" that had gathered together near her property. Martin testified that she did not see the shooter but saw his gray coat hanging out of the door of the car as he was shooting. Martin testified that she did not see any weapons in the hands of Car Wash or any of the persons who were with him at the time of the shooting.

{¶ 7} Martin testified that, after the shooting, she called 911 as she "chase[d]" the Malibu on Union Avenue. She continued to pursue the vehicle, "flying," as it made a right turn on East 88th Street, a left turn onto Bessemer Avenue and as it continued on Bessemer Avenue to East 55th Street while she remained on the telephone with the 911 operator. Martin testified that the 911 operator asked Martin if she could get a license plate number for the Malibu. Martin told her that the license plate number included a C-O or C-zero and that the plate had a blue ribbon around it, "like they got it from a car lot." Martin testified that the 911 operator told her to stop chasing the Malibu but that she refused to do so and hung up the phone.

{¶ 8} The Malibu made a sharp right turn on Grand Avenue. Martin stated that she had to wait for a truck to pass but then continued her pursuit of the Malibu. When Martin saw the Malibu again, a young woman was "just out the car." Martin

testified that she lost the Malibu on Kinsman Road when she stopped and "cussed a girl out." Martin stated that the police called her back and that she told them she lost the Malibu on Kinsman Road. According to Martin, the police told her to go back to the scene because they may need to talk to her. Martin complied and returned to the scene of the shooting.

{¶ 9} Martin testified that when she returned to the scene, she saw an ambulance and was told that a girl had been shot. Martin stated that she later learned that the exterior of her house had also been damaged in the incident, i.e., that the right side of her house "has like a ricochet" and a piece of the house was missing. Martin stated that she knew the piece of the house had not been missing prior to the incident because she had recently obtained an estimate for exterior painting and shingle replacement and there had been no damage at the time. Martin also indicated that she had not seen any damage when she was in the yard with her dogs shortly before the shooting.

{¶ 10} Martin testified that she spoke with police and told them what she had observed. Approximately a week after the shooting, police visited her at her home on Union Avenue and asked her to view a photo array. Detective McNeeley, one of the officers assigned to investigate the shooting, testified that during the course of the investigation, a suspect was "developed" and that officers put together a "six-pack" photo array to show the witnesses. The photo array was shown to Car Wash and Martin, separately.

{¶ 11} Martin testified that she believed she would be able to identify the individuals involved in the incident because she had had ample time to observe the two males "from behind" while she was following them to the parking lot before the shooting, including "the coat, the shoes, the pants, the little dreads, like all of that." She also stated that she had also "looked at everyone" and had made eye contact with each of the individuals in the Malibu while they were waiting to turn out of the parking lot prior to the shooting. Martin explained:

> When we rode past by the individual in the car, I guess I was looking at the driver crazy like, and the passenger might have said something, and I looked him straight in his face.
>
> Eye contact. I looked everybody in that car with eye contact. Everybody in the car because they had to wait. So as they were waiting to turn out of the parking lot to go back west, I'm standing like, I'm on the side of them like this just looking inside the car, looking at everybody in the car.

{¶ 12} When viewing the photo array, Martin identified "[n]umber 2" in the photo array (i.e., Lewis) as the shooter and indicated that she was "75 percent sure" he was the shooter. With respect to the level of certainty of her identification, Martin explained:

> Q. When we're talking about your observation of the faces of the four people in the car, you sound very confident today.
>
> A. Uh-huh.
>
> Q. You're only 75 percent sure a week after this occurred. What makes you unsure? Why not be 100 percent sure?
>
> A. Nothing in life is 100 percent sure.
>
> Q. Why not be 95 percent sure?

A. Because I chose to choose 75.

Q. What makes you unsure about your selection?

A. I'm really not unsure, because I know what I seen, but I just — at that time, that's how I felt about it.

{¶ 13} Martin indicated that she could also describe the clothing the shooter had been wearing at the time of the shooting:

> The coat was like a gray bubble-ish coat, like a quilted. It wasn't like a spring like bubble coat, but it was a nice spring like, soft like, bubble jacket. It was gray with a hood. It had a hood. I seen the dreads, and dark pants, and boot-like tennis shoes. They looked like boots to me. And it's like, I want to say it's like a patch or something on the back of that coat. I know that there is a patch on the back of that coat. I want to say like the left part. I think it's like black or something, but I know there's something on that jacket that I noticed.

{¶ 14} When asked whether the person she had picked out in the photo array and whom she had identified as the shooter was in the courtroom, Martin responded affirmatively and pointed to Lewis. The photo array Martin signed was admitted into evidence at the hearing.[1]

{¶ 15} Detective McNeeley testified that as a result of his investigation, he learned that there were five victims of the January 15, 2016 shooting: Tiffany Curry, LeAndre Tucker (a.k.a. "Car Wash"), Betty McClarin (Car Wash's aunt), Christian Boldin and Martin. Curry sustained a gunshot wound to the leg. The other victims sustained no physical injuries.

---

[1] The three exhibits admitted into evidence at the probable cause hearing were not included in the record forwarded to this court on appeal.

{¶ 16} McNeeley testified that police identified Lewis' Facebook and Instagram accounts and, based on photographs that were posted on those accounts, obtained search warrants for those accounts. McNeeley stated that, prior to reviewing Lewis' social media accounts, he was aware that a witness had described the shooter as having worn a "silver, gray bubble jacket" at the time of the shooting. He indicated that when he reviewed Lewis' social media accounts, he discovered that Lewis had posted multiple photographs on social media on the date of the incident, including a photograph in which Lewis was wearing dark-colored pants and black shoes and holding two firearms and a photograph in which Lewis was wearing dark-colored pants, black shoes and a "gray bubble coat."

{¶ 17} McNeeley testified that in one of the photographs, Lewis and another black male were both wearing silver jackets made of "puffy but not completely puffy material." McNeeley acknowledged that if Martin had observed only a sleeve of one of those jackets, it would be "hard to tell those apart." Although the photographs were posted on January 15, 2016, McNeeley could not say when the photographs had been taken. Copies of two of the photographs posted on social media were admitted into evidence at the hearing.

{¶ 18} McNeeley testified that he had not been familiar with Car Wash or Lewis prior to January 15, 2016 shooting. McNeeley stated that, when interviewing Car Wash's mother, he learned that Car Wash was affiliated with the Unwin Gang, a local street gang associated with Unwin Street in Cleveland. He did not uncover any information to suggest that any of the other victims had any gang affiliation.

{¶ 19} Upon further investigation, McNeeley also learned that Lewis had been a member of the Clout Gang, a gang out of the Morris Black Projects, and that since Lewis had been released from juvenile detention, he had been associating with the Muddy Gang, a gang in the Buckeye neighborhood that uses red lettering and has a "common symbol" "for graffiti[,] shirts, and stuff like that." McNeeley indicated that several posts Lewis had made on his social media accounts referenced the Muddy Gang and that one of Lewis' family members was a founding member of the Muddy Gang. McNeeley stated that he also learned that the Clout Gang reportedly had "a beef" with the Unwin Gang.

{¶ 20} McNeeley testified that on January 22, 2017, a warrant was issued for Lewis' arrest. He stated Lewis' mother or aunt allowed police to enter the residence and that Lewis was in his bedroom when police arrived. When officers entered Lewis' bedroom, they saw two revolvers and ammunition "in plain sight." McNeeley testified that he then left the residence to seek a search warrant. After a search warrant was obtained for Lewis' residence, police seized the revolvers and ammunition along with "a gray or silver bubble jacket" and marijuana. McNeeley identified Lewis in the courtroom.

{¶ 21} McNeeley testified that a spent round was recovered from Curry's leg and that, as part of his investigation, that round and the weapons seized from Lewis' residence were submitted for comparison. However, the results of that comparison were not introduced into evidence at the probable cause hearing.

{¶ 22} After all the evidence was presented, the state moved to dismiss Count 6 — the felonious assault of Martin — with prejudice on the ground that there was no evidence that there was any attempt to cause physical harm to Martin, i.e., the evidence showed that Martin was behind the Malibu when the shooting took place and the gun was never pointed in her direction.

{¶ 23} After the state's closing argument, Lewis' counsel indicated that he had "kind of a unique request." He stated: "[W]e actually don't contest the finding of probable cause. We leave that to the discretion of the Court." However, if the juvenile court were to find probable cause existed, he requested that Lewis "be given bail" and that that "be done today."

{¶ 24} After hearing the evidence and arguments of counsel, the juvenile court found that Lewis was 17 years old at the time of the conduct charged and that there was probable cause to believe that Lewis had committed the acts charged in Counts 1-5 and 7.

{¶ 25} The juvenile court found that the state had failed to establish probable cause as to the act charged in Count 8 — improperly discharging firearm into the habitation of Martin. The juvenile court explained:

> Now, Count 8. Ms. Martin testified to the fact that she was walking her dogs and didn't see any defects to her home. However, when the gun was fired in proximity to her property, she claims that when she returned she saw the defect in her home.
>
> The problem that the Court has is that there was never any testimony about any bullet fragments or a bullet being found near the home, or any casings being found near the home. And while the

gunshots were towards Car Wash and the group, there's no testimony that any gun was directly fired at the home.

I know the transfer of intent can be applied, but the issue the Court has is finding probable cause where there can be other reasons for the defect. Without any further evidence the Court finds that probable cause has not been established for Count 8.

{¶ 26} The juvenile court dismissed Counts 6 and 8 with prejudice. On April 26, 2016, the case was transferred to the general division.

**Proceedings in the General Division**

{¶ 27} On April 3, 2017, a Cuyahoga County Grand Jury indicted Lewis in an 8-count indictment[2] as follows:

- One count of attempted murder in violation of R.C. 2903.02(A) and 2923.02, a first-degree felony, with one-, three- and five-year firearm specifications, a criminal gang activity specification and weapon forfeiture specifications (Count 1);

- One count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony, with one-, three- and five-year firearm

---

[2] On May 11, 2016, Lewis was indicted in Cuyahoga C.P. No. CR-16-606037. Following the Ohio Supreme Court's decision in *State v. Aalim* ("*Aalim I*"), 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, paragraph one of the syllabus — in which the court held that the mandatory transfer of juveniles to the general division violates juveniles' right to due process under Article I, Section 16 of the Ohio Constitution — the case was transferred back to the juvenile court, so that the juvenile court could conduct an amenability hearing pursuant to R.C. 2152.12(B), and the indictment in Cuyahoga C.P. No. CR-16-606037 was dismissed without prejudice.

Once the case was back in juvenile court, Lewis was referred to the court's diagnostic clinic for a psychological evaluation, and a "bindover hearing" was scheduled for March 8, 2017. On February 22, 2017, the Ohio Supreme Court granted a stay of execution of *Aalim I*. The "bindover hearing" was cancelled, and Lewis was reindicted in Cuyahoga C.P. No. CR-17-615253. On May 25, 2017, the Ohio Supreme Court granted the state's motion for reconsideration, vacated its decision in *Aalim I* and issued a new decision in which it held that "the mandatory bindover of certain juvenile offenders under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) complies with due process and equal protection as guaranteed by the Ohio and United States Constitutions." *State v. Aalim* ("*Aalim II*"), 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 38.

specifications, a criminal gang activity specification and weapon forfeiture specifications (Count 2);

- Three counts of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, with one-, three- and five-year firearm specifications, a criminal gang activity specification and weapon forfeiture specifications (Count 3-5);

- One count of discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a first-degree felony, with one-, three- and five-year firearm specifications and weapon forfeiture specifications (Count 6);

- One count of improperly discharging firearm into habitation in violation of R.C. 2923.161(A)(1), a second-degree felony, with one-, three- and five-year firearm specifications and weapon forfeiture specifications (Count 7) and

- One count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(A), a fourth-degree felony, with one-, three- and five-year firearm specifications and weapon forfeiture specifications (Count 8).

{¶ 28} On September 18, 2017, the parties reached a plea agreement. Pursuant to the plea agreement, Lewis pled guilty to: Count 1 (amended to delete the five-year firearm specification); Counts 4 and 5 (amended to delete the three- and five-year firearm specifications) and Count 7 (amended to delete the three- and five-year firearm specifications). Following a plea colloquy in which the trial court confirmed Lewis' understanding of the counts to which he was pleading guilty, the trial court accepted Lewis' guilty pleas and the remaining counts were nolled. The trial court referred Lewis for a presentence investigation and report ("PSI") and scheduled a sentencing hearing for the following month.

{¶ 29} The sentencing hearing was postponed after Lewis filed a motion to withdraw his guilty pleas and the trial court granted defense counsel's motion to withdraw. The trial court appointed new counsel for Lewis, denied Lewis' motion to withdraw his guilty pleas and the sentencing hearing was held on March 8, 2018.

{¶ 30} Defense counsel, Lewis' father, the state, Cleveland Police Detective Bauhof and Lewis addressed the trial court during the sentencing hearing. Defense counsel stated that Lewis did not believe his guilty pleas were entered knowingly, intelligently and voluntarily and that Lewis was "still seeking to maintain his innocence and withdraw his plea[s]." He indicated that, therefore, he did not have "a statement of remorse or an explanation of circumstances" to offer "other than to ask the court to look at the facts and circumstances and background of this young man."

{¶ 31} Lewis' father stated that he was granted custody of Lewis after he was "positive tox" at birth and that he had been told Lewis would have developmental issues, including attention deficient issues and mental and emotional disabilities, due to his mother's drug and alcohol use during pregnancy. Lewis' father indicated that, "in his mind," Lewis "want[s] to be a gangster" but "he's not." He stated that Lewis is "not a normal child," "[h]e doesn't process things normal" and "[h]e's an easier [sic] follower." Lewis' father indicated that Lewis had earned good grades in school and had graduated from high school. He further stated that although Lewis had been previously involved with the juvenile justice system, the juvenile court judge had "worked with him every step of the way" and that Lewis had never been

sent to a juvenile facility. Lewis' father said that he "would just like to see [Lewis] have the life that he deserve[s] * * * and turn this thing around."

{¶ 32} The state pointed out that, although he pled guilty, Lewis had never "accept[ed] responsibility" for his actions despite "overwhelming evidence," including both forensic evidence and "some of [Lewis'] own words and his own actions," that he was the "trigger man" in the January 15, 2016 shooting. The state related that, according to the PSI, Lewis "denie[d] his involvement" in the shooting, but that Lewis had been identified in a photo array as the shooter and, "mere moments" after the shooting, Lewis was "bragging about it on Facebook" (stating that he and another individual had "chased down the victim") and was posing with firearms that were later found during the execution of the search warrant at Lewis' residence — one of which matched the bullet that was taken from the victim's leg.

{¶ 33} The state acknowledged that Lewis had "some mental health issues" but that he also had "negative peer association" and was "gang-affiliated." The state outlined Lewis' lengthy history of escalating criminal conduct, beginning with a concealed carry weapon charge in 2012. The state asserted that firearms were part of Lewis' "way of life" and stated that Lewis had been previously charged with acts of burglary, theft, multiple assaults, disorderly conduct, other firearm charges and aggravated riot. The state also noted that the victim who suffered the gunshot wound was not the person whom Lewis had targeted but was an innocent bystander.

{¶ 34} The state requested the imposition of consecutive sentences and argued that a sentence "starting at 20 years" would be justified in the case given "the

multiple victims, the history of the defendant, the harm caused to the one individual, [and] the targeting and the bragging about it." The state asserted that Lewis is "someone that just hasn't gotten it, and the public needs to be protected from an individual like this."

{¶ 35} Detective Bauhof stated that, at some point, Lewis "started popping up real big in the gang investigations" and that when Lewis started to be known to law enforcement officers in the juvenile justice system, he requested the assistance of the gang impact unit "to help with Solomon Lewis" because Lewis was "a terror at that time," reportedly involved in multiple different shootings.

{¶ 36} He stated that Lewis was "a very smart individual" and was both "a leader and a follower," i.e., he looked up to and followed the "older gang bangers from Buckeye" but, at the same time, was "a leader in the Morris Black area, where all his peers in Morris Black looked up to him," and he was a founding member of the Clout Gang.

{¶ 37} Bauhof stated that when he first heard about the January 15, 2016 shooting, he thought it "sound[ed] like" Lewis and, "[k]nowing how dangerous Solomon Lewis was," immediately recommended that the case be transferred to the gang impact unit for further investigation. Bauhof claimed that Lewis is "addicted to his reputation, drugs, and guns" and that he would "taunt law enforcement with the social media" — i.e., keeping his social media accounts public, knowing that law enforcement was watching his account — showing "photographs of all his guns,"

stating "what he got away with" and "talk[ing] in code about all his criminal activity." He stated that Lewis "has a large fan base" and is "a very dangerous individual."

{¶ 38} Lewis was the final person to address the trial court. He maintained his innocence and contended that the "alleged evidence" detectives obtained from social media was "all one-sided" and lacked context. He stated that he did not understand how the shooter "allegedly fit [his] description" given that the shooting occurred when school was letting out in an area where there are "thousands of kids right there with gray bubble coats and dreads." Although Lewis did not deny that he had posted multiple photographs of himself on social media posing with firearms, he claimed that there was no evidence the photographs had been taken shortly before or after the shooting and stated that certain of the photographs were "three or four years old."

{¶ 39} With respect to his history with the juvenile justice system, Lewis claimed that although he had been "accused of a lot of things" and "charged with all type of crimes" in juvenile court, "there was really no significant convictions" and for that reason, he was never sent to the Ohio Department of Youth Services. In response to Lewis' claim, the trial judge reviewed Lewis' history of involvement with juvenile justice system with Lewis.

{¶ 40} Lewis also read a letter he had written in which he claimed that he had entered "an unknowing and unwilling plea" and that "the only reason [he] took the plea was because [defense counsel] forced [him] to." Lewis claimed that, on the date of trial, his prior counsel told him that there was "no way" Lewis could "win the

case" because counsel had failed to advise the trial court that he wanted to file multiple suppression motions and "forgot" to send out subpoenas witnesses to testify on Lewis' behalf. According to Lewis, his prior counsel told him that "the only way out was to cop out" and that Lewis was "currently going through the motions with the Supreme Court of Ohio disciplinary counsel because of that."

{¶ 41} Lewis stated that he told his prior counsel that he would not "plead to something I didn't do" and that prior counsel assured him that he was "not pleading to the attempted murders and felonious assaults." Lewis indicated that he ultimately agreed to a plea deal — which he believed carried a four-year sentence — "only for some things that were allegedly found in my grandmother['s] house" because prior counsel told him that if he "didn't take the plea," his grandmother would be charged. Although Lewis acknowledged that the trial judge had asked him, during the plea colloquy, whether he understood the offenses to which he was pleading guilty and that Lewis had responded affirmatively, in his letter Lewis asserted:

> when you started to add the numbers and ended up with at least a mandatory eight years, it was like at that point I was physically in the courtroom, but mentally I was somewhere else. I really don't know where I was at mentally that day, but I'm a hundred percent sure I made an unconscious decision that I regret.

{¶ 42} Lewis stated that he had also wanted to withdraw his guilty pleas because the trial court had appointed him a new attorney who was "willing to fight

for me" and because "my attorney and I have evidence that, if presented at trial, will prove my direct innocence."[3]

{¶ 43} After reviewing the PSI, additional documentation submitted by defense counsel regarding Lewis' receipt of social security benefits and treatment for mental health issues[4] and considering the "overriding purposes and principles of sentencing" and the statements made at the sentencing hearing, the trial court sentenced Lewis at the sentencing hearing to an aggregate 18-year prison term as follows:

- As to Count 1, 11 years — three years on the firearm specification to be served prior to and consecutive to three years on the criminal gang specification to be served prior to and consecutive to five years on the underlying offense (attempted murder);

- As to Count 4, seven years — one year on the firearm specification to be served prior to and consecutive to six years on the underlying offense (felonious assault);

- As to Count 5, five years — one year on the firearm specification to be served prior to and consecutive to four years on the underlying offense (felonious assault); and

- As to Count 7, seven years — one year on the firearm specification to be served prior to and consecutive to six years on the underlying offense (improperly discharging firearm into habitation).

---

[3] Lewis does not assign as error the denial of his motion to withdraw his guilty pleas.  Accordingly, we do not address the merits of that motion in this appeal.

[4] This documentation was not included in the record forwarded to this court on appeal.

**{¶ 44}** At the sentencing hearing, the trial court ordered that the sentences on Counts 1 and 5 be served concurrently to one another, that the sentences on Counts 4 and 7 be served concurrently to one another and that the sentences on Counts 1 and 5 (an aggregate of 11 years) be served consecutively to the sentences on Counts 4 and 7 (an aggregate of seven years).[5] The trial court also imposed five years of mandatory postrelease control.

**{¶ 45}** With respect to its decision to impose consecutive sentences, at the sentencing hearing, the trial court stated:

> Now, as has been noted and talked about and gone through, I do note that you have a — I've certainly seen worse juvenile records — but at least I would characterize as an extensive record, which also includes violence, even though they're misdemeanors, there's assaults, there are breaking and enterings, there's pursuits, there's weapons offenses, that, in addition to the course of conduct that this case involves, shooting at people who were trying to track down when you committed the first offense.

> And so I do find that consecutive sentences are necessary to protect the public from future crimes and to punish you and that they are not disproportionate to the seriousness of your conduct and to the danger that you pose to the public. Specifically, these crimes here were part of a course of conduct by you and that your harm caused to these individuals, multiple individuals, was so great or unusual that no single prison term for any of these offenses committed as part of the course of conduct would adequately reflect the seriousness of your conduct.

---

[5] However, in its March 12, 2018 sentencing journal entry, the trial court imposed a six-year sentence on Count 4, i.e., a one-year sentence on the firearm specification to be served prior to and consecutive to a *five*-year sentence on the underlying offense. (Emphasis added.) The trial court further stated:

> Counts 1 and 5 are ordered to run concurrent to each other.
> Counts 4 and 7 are ordered to run concurrent to each other.
> Counts 1 and 4 are ordered to run consecutive, for a prison term of
> 18 years [sic].

Again, I also find that your criminal history does demonstrate that consecutive sentences are necessary to protect the public from future crimes by you.

{¶ 46} The trial court set forth its consecutive sentence findings in its

sentencing journal entry as follows:

The court imposes prison terms consecutively finding that consecutive service is necessary to protect the public from future crime or to punish defendant; that the consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger defendant poses to the public; and that, defendant's history of criminal conduct demonstrate that consecutive sentences are necessary to protect the public from future crime by defendant.

{¶ 47} Lewis appealed, raising the following five assignments of error for

review:

Assignment of Error I: The juvenile court erred by finding probable cause existed to transfer this matter to the common pleas court in violation of [the] Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

Assignment of Error II: The common pleas court lacked jurisdiction over the charge in Count Seven because the same improper-discharge-into-a-habitation charge was dismissed in the juvenile court on a finding that the State had not shown probable cause, violating [the] Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

Assignment of Error III: The trial court erred by imposing consecutive sentences, as the overall record did not support the trial court's findings that consecutive sentences, resulting in an 18-year term of imprisonment, were needed or appropriate under the factors set forth in R.C. 2929.14(C)(4).

Assignment of Error IV: Lewis was deprived of the effective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

Assignment of Error V: Mandatory bindovers under R.C. 2152.12(A)(1)(a)(i) and Ohio's "more than a mere suspicion standard" violate due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 48} For ease of discussion, we address Lewis' assignments of error out of order.

**Law and Analysis**

**Probable Cause**

{¶ 49} In his first assignment of error, Lewis contends that the trial court erred by finding "sufficient probable cause to believe that Lewis was the individual that fired the firearm out of the car" and that, therefore, jurisdiction of the case was not properly transferred to the general division.[6]

{¶ 50} To establish probable cause in a bindover proceeding, the state must present credible evidence supporting each element of the offense. *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). Probable cause in this context requires "credible evidence that 'raises more than a mere suspicion of guilt'" but does not require evidence of guilt beyond a reasonable doubt. *In re D.M.*, 140 Ohio St.3d

---

[6] Citing *State v. Powell*, 4th Dist. Gallia No. 20CA3, 2021-Ohio-200, and *State v. Zarlengo*, 7th Dist. Mahoning No. 20 MA 0036, 2021-Ohio-4631, the state urges us to find that Lewis waived his right to challenge the sufficiency of the evidence supporting the juvenile court's probable cause finding by entering his guilty pleas. Lewis responds that other courts, including this court, have found that a guilty plea "does not waive the right to appeal the [juvenile court's] probable cause determination," citing *State v. Riggins*, 68 Ohio App.2d 1, 5, 426 N.E.2d 504 (8th Dist.1980); *State v. Amos*, 1st Dist. Hamilton No. C-150265, 2016-Ohio-1319, ¶ 28, and *State v. E.T.*, 2019-Ohio-1204, 134 N.E.3d 741, ¶ 38, 43-45 (10th Dist.). We need not resolve that issue here because, in any event, as detailed below, the state presented sufficient credible evidence to support the juvenile court's finding of probable cause.

309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 10, quoting *Iacona* at 93. In other words, probable cause in this context is "'"a fair probability, not a prima facie showing, of criminal activity."'" *State v. Martin*, 8th Dist. Cuyahoga No. 108996, 2021-Ohio-1096, ¶ 32, quoting *State v. Starling*, 2d Dist. Clark No. 2018-CA-34, 2019-Ohio-1478, ¶ 37, quoting *State v. Grimes*, 2d Dist. Greene No. 2009-CA-30, 2010-Ohio-5385, ¶ 16; *see also In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, ¶ 20 (7th Dist.) ("Probable cause is a flexible concept grounded in fair probabilities which can be gleaned from considering the totality of the circumstances."), citing *Iacona* at 93. Probable cause requires "'a reasonable ground for belief of guilt.'" *In re B.W.* at ¶ 20, quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It does not require a showing that a belief is correct or that it is more likely true than false. *In re B.W.* at ¶ 20, citing *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *see also In re J.R.*, 8th Dist. Cuyahoga No. 110241, 2021-Ohio-2272, ¶ 32.

{¶ 51} Lewis contends that Martin's testimony was insufficient to establish probable cause that he was the shooter because all she saw was "an arm point out of the car" wearing a gray coat similar to a coat worn by one of the males she had followed through the parking lot prior to the shooting and because one of the photographs introduced by the state showed another male wearing a similar coat. Lewis also contends that Martin's testimony was insufficient because (1) she did not identify Lewis in court "as the shooter," but instead identified him as the person she had identified in the photo array and (2) when Martin identified him in the photo

array, "just days after the incident," she "had only been 75 percent sure" that the photo she picked out was that of the shooter. Lewis further argues that although Detective McNeeley testified regarding the two revolvers seized from Lewis' bedroom and the photograph of Lewis holding two firearms posted on the date of the shooting, this evidence was insufficient to establish probable cause that Lewis was the shooter because "nothing presented at the bindover hearing tied the revolvers to the shooting" and there was no evidence as to when the photograph was taken.

{¶ 52} In considering whether probable cause exists, the juvenile court must "evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause." *Iacona* at 93. However, "while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 44; *see also In re D.M.* at ¶ 10.

{¶ 53} Because it involves questions of both fact and law, our review of a juvenile court's probable cause determination is usually mixed. *In re A.J.S.* at ¶ 1, 51. We defer to the juvenile court's determinations regarding witness credibility, reviewing those determinations for abuse of discretion. However, whether the state has presented sufficient evidence to support a finding of probable cause to believe

that the juvenile committed the charged act, is a question of law we review de novo, without any deference to the juvenile court. *In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 31; *In re A.J.S.* at ¶ 1, 51. In this case, however, as stated above, Lewis' counsel expressly stated, after all the evidence was presented at the probable cause hearing, that Lewis did not contest the finding of probable cause and left the determination to the discretion of the juvenile court.[7]

{¶ 54} At this stage of the proceedings, the state was not required to prove the truth of the allegations against Lewis. The state had to present credible evidence showing probable cause supporting each element of the offense charged. Based on the evidence presented at the probable cause hearing, we agree that there was more than a mere suspicion that Lewis had committed the acts of attempted murder with which he had been charged.

{¶ 55} As it relates to this assignment of error, Lewis was charged in juvenile court with acts that would constitute attempted murder in violation of R.C. 2903.02(A) and 2923.02, felonious assault in violation of R.C. 2903.11(A)(1) and felonious assault in violation of R.C. 2903.11(A)(2), if he were an adult. R.C. 2903.02(A) provides, in relevant part: "No person shall purposely cause the death of another." R.C. 2923.02(A) provides: "No person, purposely or knowingly, and

---

[7] Although Lewis arguably forfeited all but plain error review by failing to contest the probable cause finding below, we would reach the same result if Lewis had contested probable cause below — i.e., review for plain error is not the difference between the court granting relief and denying relief as to this assignment of error. As explained below, we find that the state presented sufficient credible evidence to support the juvenile court's finding that there was probable cause to believe that Lewis committed the acts charged in Counts 1-5 and 7 of the juvenile court complaint.

when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2903.11(A)(1) provides, in relevant part: "No person shall knowingly * * * [c]ause serious physical harm to another." R.C. 2903.11(A)(2) provides, in relevant part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 56} As detailed above, Martin testified that (1) she saw Lewis and another male chase Car Wash and (2) a few minutes later, she saw Lewis fire multiple shots from a vehicle (that had stopped suddenly) into a group of people that included Car Wash. Martin testified that she observed not only what the shooter was wearing but also that she observed and "made eye contact" with each of the individuals in the Malibu minutes before the shooting, including the male seated in the front passenger seat, who shot into a group of people that included Car Wash. Martin identified Lewis as the shooter with 75 percent certainty during a photo array conducted a week after the incident and again in court during the probable cause hearing.

{¶ 57} The juvenile court found Martin's testimony to be credible. As the juvenile court stated when explaining its probable cause finding on the attempted murder charge at the conclusion of the probable cause hearing:

> This is a preliminary hearing, so the State doesn't have the burden of demonstrating proof beyond a reasonable doubt in each and every element. They just need to provide some credible evidence to establish that probable cause exists.

And it says that, in fact, based on the totality of the circumstances here that you were the one who committed this offense * * * based on the information that's been provided to this Court from Ms. Martin who was one, an independent witness to this particular action having no stake in the outcome of this, and while she had some familiarity with the alleged victim, she didn't even know his name.

So in terms of any bias here, there wouldn't be much that she were to come in here and be dishonest or untruthful about her testimony.

In fact, it appears as though she was putting herself at risk and engaging in some of these activities surrounding this incident, so the Court finds her testimony to be credible.

And she testified to seeing an individual who just happens to have on the same type of clothing that you do in these pictures that shows your face, chasing Car Wash or LeAndre Tucker.

She then gets in the car and follows you and another individual to another vehicle, sees you get into the passenger side of that vehicle, front seat passenger's side, and then sees you as you're traveling towards her, and does catch a glimpse of your face, as well as the other individuals that were in the vehicle.

* * *

She testifies being not too far away to avoid this vehicle when it just stops unexpectedly, and she notices the crowd of people that are to her right and to the right of this vehicle when it stops and the door swings open and shots are fired towards a group of people.

More than one. She testified to at least three shots being fired, and that the individuals dispersed trying to get away from being struck by the bullets that are flying. She even testified to one individual falling to the ground. Clearly, that shows an overt act with a deadly weapon, and being fired at mass or the mass areas of individuals, that meets the definition or requirement for attempted murder.

{¶ 58} Detective McNeeley testified as to the identity of each of the victims, i.e., Car Wash, Curry, McClarin and Boldin, which he learned during the course of

his investigation. McNeeley further testified regarding Curry's gunshot wound to the leg, Lewis' affiliation with the Clout Gang and the Muddy Gang and Car Wash's affiliation with the Unwin Gang with which the Muddy Gang had a "beef."

{¶ 59} The evidence presented at a probable cause hearing "'does not have to be unassailable' to qualify as credible." *In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, at ¶ 21, quoting *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 46; *see also In re J.R.*, 2021-Ohio-2272, at ¶ 41.

{¶ 60} Following a thorough review of the record, we find that the state presented sufficient credible evidence to support the juvenile court's finding that there was probable cause to believe that Lewis committed acts which, if committed by an adult, would constitute attempted murder and felonious assault, along with the associated specifications, as charged in Counts 1-5 and 7 of the juvenile court complaint. Lewis' first assignment of error is overruled.

### Constitutionality of Mandatory Bindover and "Mere Suspicion" Conviction on Count 7 – Improperly Discharging Firearm into Habitation

{¶ 61} In his second assignment of error, Lewis argues that the general division lacked jurisdiction over the charge in Count 7 (improperly discharging a firearm into habitation) because the juvenile court dismissed that same charge (Count 8 in the juvenile court) for lack of probable cause. The Ohio Supreme Court's recent decision in *State v. Smith*, Slip Opinion No. 2022-Ohio-274, controls the resolution of this assignment of error. In *Smith*, the court held that the general division lacked jurisdiction over several counts because the juvenile court had found

that the acts related to those counts were not supported by probable cause and that, therefore, there was "a jurisdictional defect in the bindover process." *Id.* at ¶ 43. The court explained that "[a] finding of probable cause is a jurisdictional prerequisite under R.C. 2152.12 to transferring a child to adult court for prosecution of an act charged." *Id.* at ¶ 44. "In the absence of a juvenile court's finding probable cause or making a finding that the child is unamenable to care or rehabilitation within the juvenile system, no adult court has jurisdiction over acts that were charged in but not bound over by the juvenile court." *Id.*

{¶ 62} The state concedes this error. Accordingly, Lewis' second assignment of error is sustained. Lewis' conviction on Count 7 is hereby vacated.

**Ineffective Assistance of Counsel**

{¶ 63} In his fourth assignment of error, Lewis argues that if this court were to find, in reviewing Lewis' first and second assignments of error, that (1) defense counsel's failure to object to the juvenile court's probable cause finding and/or failure to argue below that the general division lacked jurisdiction over Count 7 leads this court to review the trial court's decision for plain error and (2) "review for plain error is the difference between the [c]ourt granting relief and denying relief," then he was denied the effective assistance of counsel in violation of his rights under the Sixth and Fourteen Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution because counsel was "prejudicially ineffective in failing to object and make those arguments."

{¶ 64} Based on our resolution of Lewis' first and second assignments of error, Lewis' fourth assignment of error is moot.

### Constitutionality of Mandatory Bindover and Standard for Probable Cause Determination

{¶ 65} In his fifth assignment of error, Lewis argues that mandatory bindover under R.C. 2151.12(A)(1)(a)(i) and Ohio's "more than a mere suspicion" standard for determining probable cause violate his rights to procedural and substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. Once again, Lewis did not raise these arguments below. *See State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7 ("'[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.'"), quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). As such, they are subject to plain error review.[8] *State v. Debose*, 8th Dist. Cuyahoga No. 109531, 2022-Ohio-837, ¶ 14; *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16 (appellate court has discretion to review a forfeited constitutional challenge to a statute for

---

[8] The state maintains that this assignment of error should also be overruled because this is not a true mandatory bindover case, i.e., after the Ohio Supreme Court issued its decision in *Aalim I*, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, Lewis' "initial indictment in CR-16-606-37 was dismissed in order to allow [Lewis] to return to the juvenile court for an amenability determination prior to the indictment in CR-17-615253." However, as noted above, there is nothing in the record to indicate that an amenability determination was ever made.

plain error), citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 377-378.

{¶ 66} Plain error is an obvious error or defect in the trial court proceedings that affects a substantial right. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Plain error requires a showing that there was an error, that the error was plain or obvious, that but for the error the outcome of the proceeding would have been otherwise and that reversal is necessary to correct a manifest miscarriage of justice. *Buttery* at ¶ 7, citing *Quarterman* at ¶ 16. The party asserting plain error "bears the burden of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *Quarterman* at ¶ 16. Lewis has not made any plain error argument here.

{¶ 67} The Ohio Supreme Court has previously rejected similar arguments challenging the constitutionality of Ohio's mandatory-bindover procedure. *See Aalim II*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 38 (holding that "the mandatory bindover of certain juvenile offenders under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) complies with due process and equal protection as guaranteed by the Ohio and United States Constitutions"); *see also Martin*, 2021-Ohio-1096, at ¶ 43 (stating that in *Aalim II*, "the Supreme Court of Ohio ruled that the 'more than mere suspicion' standard does not violate a child's due process rights"). Indeed, Lewis acknowledges that "these arguments have been rejected by the Supreme Court of Ohio," but states that he "raises them in order to preserve them for further review."

**{¶ 68}** Further, with respect to his contention that Ohio's "more than a mere suspicion" standard for determining probable cause is unconstitutional, Lewis provides no argument explaining why he believes the "more than a mere suspicion" standard for determining probable cause is unconstitutional. He simply "submits" that "the 'more than a mere suspicion' standard do[es] not satisfy either procedural or substantive due process." Accordingly, we need not consider this issue. *See State v. Bond*, 8th Dist. Cuyahoga No. 110520, 2022-Ohio-1246, ¶ 17; App.R. 12(A)(2); App.R. 16(A)(7).

**{¶ 69}** Lewis' fifth assignment of error is overruled.

**Imposition of Consecutive Sentences**

**{¶ 70}** In his third assignment of error, Lewis argues that the trial court erred in imposing consecutive sentences because the "overall record" did not support the trial court's findings that consecutive sentences were "needed" or "appropriate."

**{¶ 71}** We review felony sentences under the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce or otherwise modify a sentence, or it may vacate a sentence and remand for resentencing, if it "clearly and convincingly finds" that (1) the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D), 2929.14(B)(2)(e) or (C)(4) or 2929.20(I) or (2) the sentence is "otherwise contrary to law." "'Clear and convincing evidence is that measure or degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to

the facts sought to be established.'" *State v. Franklin*, 8th Dist. Cuyahoga No. 107482, 2019-Ohio-3760, ¶ 29, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. It is "an extremely deferential standard of review." *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.).

{¶ 72} Under Ohio law, sentences are presumed to run concurrently unless the trial court makes the required findings under R.C. 2929.14(C)(4). *State v. Reindl*, 8th Dist. Cuyahoga Nos. 109806, 109807, and 109808, 2021-Ohio-2586, ¶ 14; *State v. Gohagan*, 8th Dist. Cuyahoga No. 107948, 2019-Ohio-4070, ¶ 28. To impose consecutive sentences, the trial court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public and (3) at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4). To make the requisite statutory findings, "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'" *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999). The trial court must make the requisite findings in support of the imposition of consecutive sentences at the sentencing hearing and incorporate those findings into its sentencing journal entry. *Bonnell* at syllabus.

{¶ 73} Thus, a defendant can challenge consecutive sentences on appeal in two ways. First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(b); *Reindl* at ¶ 13; *State v. Nia*, 2014-Ohio-2527, 15 N.E.3d 892, ¶ 16 (8th Dist.). Second, the defendant can argue that the record "clearly and convincingly" does not support the court's findings made pursuant to R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(a); *Reindl* at ¶ 13.

{¶ 74} In this case, the trial court set forth its findings, both at the sentencing hearing and in its sentencing journal entry, that (1) consecutive sentences were necessary to protect the public from future crimes and to punish Lewis, (2) consecutive sentences were not disproportionate to the seriousness of Lewis' conduct and to the danger that he poses to the public and (3) Lewis' history of

criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crimes by Lewis.[9]

{¶ 75} Lewis does not dispute that the trial court made all of the requisite statutory findings before imposing consecutive sentences. Rather, he contends that the record does not support the trial court's consecutive sentence findings. Lewis does not, however, identify which of the trial court's consecutive sentence findings he contends are not supported by the record. He simply asserts that (1) "the record will not show by clear and convincing evidence that the findings the lower court made to match the statutory requirement were supported by the facts," (2) the trial court failed to "factor into its reasoning," when deciding whether to impose consecutive sentences," that Lewis was "dealing with a physical condition from birth and serious mental issues," (3) the trial court imposed a sentence "not just to punish Lewis but also in part to send 'a message' to 'anyone who cares to understand that if there is going to be conduct like this, it's not acceptable'" and (4) the trial court's

---

[9] As noted above, although it was not required to do so, given that only one finding under R.C. 2929.14(C)(4)(a)-(c) is required for the imposition of consecutive sentences, the trial court also found at the sentencing hearing that Lewis' crimes "were part of a course of conduct * * * and that [the] harm caused to these individuals, multiple individuals, was so great or unusual that no single prison term for any of these offenses committed as part of the course of conduct would adequately reflect the seriousness of [Lewis'] conduct." *See* R.C. 2929.14(C)(4)(b). This finding, unlike the trial court's other consecutive sentence findings, was not set forth in the trial court's sentencing journal entry.

However, even where a trial court omits a required consecutive sentencing finding from its sentencing journal entry, it is well established that the trial court's "inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Bonnell* at ¶ 30.

decision to impose consecutive sentences was based on "unproved" and "inappropriate" facts, including "the unproved and inappropriate findings that Lewis shot at Martin and her house" and that Lewis was "shooting at people who were trying to track [him] down." Lewis' arguments are meritless.

{¶ 76} As an initial matter, we note that, in framing his argument in this way, Lewis misapprehends our standard of review. As this court has previously explained:

> [T]he clear and convincing standard used by R.C. 2953.08(G)(2) is written in the negative. It does not say that the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings. In other words, the restriction is on the appellate court, not the trial judge.

*Venes*, 2013-Ohio-1891, 992 N.E.2d 453, at ¶ 21.

{¶ 77} In support of his contention that imposition of consecutive sentences resulted from "unproved and inappropriate facts" and considerations, Lewis points to the following statements by the trial court at the sentencing hearing:

> [T]he law does require that the sentence that I impose not only — the law sets forth that the overriding purposes and principles of sentencing is to protect the — I'm sorry, to punish the offender but also to protect the public from future crimes by you and others, and at least the way that I take that or the read I take from that is I think that there has to be a message that is sent, not only to you, but anyone else who cares to understand that if there is going to be conduct like this, it's not acceptable.
>
> If I was a more cynical person, I might say, fine, if you all want to shoot at each other and this is the way you want to treat each other, go somewhere out in the hills in the middle of nowhere and shoot at each other, and whatever happens, if that's what you choose to do, that's fine. But when it starts impacting innocent people who are minding

their own business, when their homes get shot up, when their legs get shot, there has to be a message sent that that's not acceptable and it's got to stop.

{¶ 78} These statements were made by the trial court when discussing its consideration of the principles and purposes of felony sentencing under R.C. 2929.11. Among the "overriding purposes of felony sentencing" a trial court must consider when sentencing a defendant on a felony offense is "punish[ing] the offender" and "protect[ing] the public from future crime by the offender and others." *See* R.C. 2929.11(A)-(B). As the trial court's statements indicate, the trial court did that here.

{¶ 79} Although the trial court is required to make findings under R.C. 2929.14(C)(4) in order to impose consecutive sentences, the trial court is not required to state its reasons supporting its findings. *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 24, 37. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 80} Following a thorough review of the record, we cannot say that the record clearly and convincingly does not support the trial court's findings in support of the imposition of consecutive sentences. To the contrary, we find ample support in the record for the trial court's consecutive sentence findings.

{¶ 81} Lewis pled guilty to multiple, serious felony offenses in this case. As set forth in the PSI and as detailed by the state and trial court at the sentencing

history, Lewis had a lengthy prior history of escalating criminal conduct, including multiple offenses involving the use of firearms. With respect to the offenses to which Lewis pled guilty in this case, the record reflects that after unsuccessfully attempting to chase after Car Wash, Lewis "track[ed] [Car Wash] down" and fired multiple shots from a vehicle in a residential area into a group of people at a time and place when children were being let out of school. The record further reflects that the shooting was gang-related and that one of the bullets Lewis fired stuck an innocent bystander in the leg. At the time of the incident, most of the victims, including the victim who was shot in the leg, were juveniles.

{¶ 82} Accordingly, we overrule Lewis' third assignment of error.

{¶ 83} Judgment affirmed in part, vacated in part, and remanded. Conviction on Count 7 having been vacated, the case is remanded for the issuance of a new sentencing journal entry reflecting (1) that the conviction on Count 7 has been vacated, (2) the correct sentence on Count 4 (as imposed by the trial court at the sentencing hearing) and (3) all of the consecutive sentence findings made by the trial court at the sentencing hearing, including its finding under R.C. 2929.14(C)(4)(b).

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MARY J. BOYLE, J., CONCUR